UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
WEI YAN YAN,                                    :

                 Plaintiff,

                           :

         -against-                             **OPINION AND ORDER**

                           :

520 ASIAN RESTAURANT CORP. d/b/a                  13-CV-2417 (KNF)
CHEF YU, and TEO SU JIN,                        :

               Defendants.    :
-------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## PROCEDURAL BACKGROUND

On April 11, 2013, Wei Yan Yan commenced this action for unpaid minimum wage and overtime compensation against 520 Asian Restaurant Corp. d/b/a Chef Yu and Teo Su Jin ("Douglas")[1], pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), and New York Labor Law ("NYLL").   The parties consented to jurisdiction by a United States magistrate judge, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  A bench trial was conducted on July 1, 2014.  Wei Yan Yan[2] and Douglas[3] testified at the trial.  Subsequently, the defendants' motion to admit into evidence page 19, lines 5 through 10, and page 20, line 11, through page 21, line 16, from the transcript of Wei Yan Yan's

---

    [1]  Teo Su Jin indicated at trial that he prefers to be addressed as Douglas; thus, the Court will refer to him as Douglas.

    [2]  Wei Yan Yan's direct testimony was provided via his affidavit, dated June 16, 2014. (Court's Exhibit 1).

    [3]  Douglas's direct testimony was provided via his affidavit, dated June 16, 2014. (Court's Exhibit 2).

pretrial deposition, was granted.  The parties submitted their post-trial proposed findings of fact and conclusions of law.

## TRIAL EVIDENCE

Plaintiff's Testimony

The only evidence the plaintiff introduced at trial was his testimony.  The plaintiff testified through his affidavit that he was employed by the defendants "from June 2006 – September 2012," and "[i]n June 2006 Teo Su Jin hired me and told me to report to the Restaurant daily at 11:00 a.m., which I did."  However, in his deposition, the plaintiff stated that he was hired on "July 5, '06," and that he remembered that date because he had "a habit of making records," which he acquired when he had his "business in Flushing for about seven years," and his restaurant business abroad "for about eight years."  The plaintiff failed to explain the inconsistency of his deposition testimony about July 5, 2006, the date he was hired by the defendants, with his trial testimony, that he was hired and started working for the defendants in June 2006.

The plaintiff testified that the defendants "required me to use an electric motor scooter/bicycle to do my job making deliveries for the Restaurant."  He stated: "I owned a motor scooter when I was first hired, and during the years I worked for the Restaurant from 2007 – September 2012 I bought additional eight electric motor scooters, for an average cost of $800 each."  He also stated that he "spent an average of $100 a month in repairs and maintenance," and, "from April 2007 – September 2012," he "spent $6,400 to purchase scooters for the Restaurant's deliveries, and $6,600 to repair and maintain them."  However, at his deposition, the plaintiff testified that: (a) "[e]ver since I started at this business or restaurant, I did use my bicycle to make delivery"; (b) he purchased "the bike because of his job"; and (c) he "[b]ought a

2

lot of it.  A lot, a lot of it because of the need for my job."  When asked on cross-examination why he used, repeatedly, the term "bicycles" during his deposition if he was referring to "motor bikes," the plaintiff became evasive and did not answer; instead he stated that he purchased "electric bikes" and "in overall general terms it's the same."

In the parties' joint pretrial order, the plaintiff stipulated that he was required by the defendants "to use and own and maintain a bicycle."  In his April 7, 2014 letter to the Court, sent pursuant to Rule 3B of the Court's Individual Rules of Practice, the plaintiff submitted Exhibit A, his calculation of damages.  In that document, the plaintiff requested $5,000 in damages for "BIKE MAINTENANCE DAMAGES (ESTIMATE)."  However, in his post-trial submissions, the plaintiff submitted Exhibit A, his calculation of damages, seeking $13,000 for "BIKE MAINTENANCE DAMAGES (ESTIMATE)."  The plaintiff failed to explain the inconsistency of his deposition testimony about the bicycles and his pre-trial calculation of related damages, estimated to be $5,000, with his trial testimony about "electric motor scooters (bicycles)" and his post-trial calculation of related damages, estimated to be $13,000.

The plaintiff also testified that he "did not use these scooters for personal use," and he "used public transportation to commute to work and kept his scooter at the Restaurant when I was not using it for deliveries."  However, when asked whether he ever took his "bicycle from home to [the] subway station," he answered: "Very infrequently, almost no."  The plaintiff did not explain the inconsistency between his statement that he did not use the bicycles for personal use with his statement that he did use them to commute, although "[v]ery infrequently."

The plaintiff testified that he reported to work daily at 11:00 a.m.  He explained that, when going to work, he left home at 9:30 a.m. and traveled on the No. 44 bus, for about 20 minutes, to the train station, where he would take the No. 7 subway train, and that to travel from

his home to where he worked, it took him "about hour and a half." Of that one "hour and a half," nearly one hour was spent traveling "from Main Street Flushing Station to the restaurant," because he "[b]asically" took the local No. 7 subway train, since no express No. 7 subway train operated after 10:00 a.m. However, the plaintiff also testified that he did not take the express No. 7 subway train because sometimes no seat was available to him and sometimes he would smoke a cigarette outside the train station before entering it; thus, the express train would not be running any longer.

The plaintiff was evasive when pressed to answer simple and clear questions about his commute to work and he provided confusing answers. Nonetheless, after he explained how he traveled to work from his home by the No. 44 bus to the Main Street subway station in Flushing and used, "basically," the local No. 7 subway train to Manhattan, the following colloquy ensued:

> Q.    I thought you said previously you took it to the Main Street Flushing subway station?
> A.    I meant I took the 44 on Main Street then to Queens Boulevard, then take subway to Manhattan.
> Q.    From what subway station?
> A.    Somewhere crossing Queens Boulevard and Main Street.  Totally two opposite directions.
> Q.    All right.  We agreed earlier you went through Main Street Flushing subway station.
> A.    Sometimes when I come back at night, but when I go to work during the day I'm always from there.
> Q.    What subway line - - when you took the M-44 bus to the station you're talking about now, what subway line was that?
> A.    E train, E or F.
> Q.    I should remind you, Mr. Wei, the first thing you said this morning was No. 7 train.
> A.    When I came back at night I took No. 7 train.

The plaintiff's testimony about his commute to work is contradictory and incredible.

The plaintiff testified that he owned a business in which he and his family "cooked and served and did all the work . . . with no other employees," and that he "was not familiar" with the

minimum wage.  At his deposition, the plaintiff stated that when he had his own business, he had

an employee and he paid the minimum wage to that employee.  The following colloquy ensued

at trial:

> Q.   You said at your deposition that you paid minimum wage.  In your trial
>       affidavit you say you were not familiar with the minimum wage.  How can
>       both be true?
> A.   There is no salary when I had the business.  Our money all put together.  It's
>       a whole family.
> Q.   So when you said at your deposition that you paid minimum wage, that was
>       not true?
>       . . .
> A.   I don't remember, I don't remember I had said that we're a family restaurant.
>       And also the restaurant was closed after a fire was set.

The plaintiff testified that, "[f]rom July 2006 - July 2008 I worked 7 days a week, twelve

hours a day."  At his deposition, he stated that, in July 2008, he was in the hospital for two days

due to an injury.  When asked about the discrepancy between stating that he worked seven days a

week in July 2008 and that he was in the hospital for two days in July 2008, the plaintiff stated

that he "rested for two days" at home, "not the hospital."  The following colloquy ensued:

> Q.   Let's go for a minute to page 34 of the [deposition] transcript, start at page
>       33.  I'm sorry.  Page 33, line 19. "Question: Did you miss work after any of
>       these accidents? Answer: Only for the couple of days that I was staying in the
>       hospital.  And after that I left the hospital within a day or two." . . . "Answer:
>       Only for the couple of days that I was staying in the hospital.  And after I left
>       the hospital within a day or two I went back to work.  Question: In every
>       case?  Answer: I was hit by a car and sent to the hospital.  For example, on
>       August 7, I'm sorry, on July 25, '08, and I was in the hospital for two days
>       and then I went back to work. . . . ."  So was it really two days?
> A.   I rested for two days.
> Q.   For?
> A.   Two days.
> Q.   I didn't - -
> A.   Two days.
> Q.   In the hospital?
> A.   No, not the hospital.
> Q.   So what you said at the deposition was not quite right . . .
> Q.   When you said at the deposition I would, "I was in the hospital for two

5

days," was that a mistake?

A. I took a rest for two days in total.

Q. I'll repeat the question.   When you said at your deposition "I was in the hospital for two days," was that incorrect?

A. I said in total two days of rest.  And for specific there are medical record [sic] could proof [sic].

The plaintiff's evasiveness and his repeated unwillingness or inability to explain discrepancies between his deposition and trial testimonies about numerous issues, including those critical to determining his damages, are the bases for the Court's rejection of the plaintiff's testimony, in its entirety, as incredible.

<u>Defendant's Testimony</u>

Douglas testified at the trial.  The Court finds that his testimony was credible.  Douglas stated that the plaintiff was hired to work six days per week and was paid $350 semi-monthly. However, shortly after the plaintiff started working, he agreed to work seven days per week until March 2007, when Douglas hired additional employees.  The plaintiff was paid an additional $20 per week, in cash, during the period when he worked seven days per week.  In 2008, the plaintiff's semi-monthly payments were increased to $500, which is the amount he was paid for the remainder of his tenure with the defendants.

Douglas testified that the plaintiff worked alternate weeks on two weekly work schedules, called "early week" and "late week."  During the early weeks, the plaintiff was scheduled to work from 11:30 a.m. to 9:30 p.m., Monday through Friday, with two half-hour meal breaks beginning at 3:00 p.m. and 8:00 p.m.  During the late weeks, the plaintiff was scheduled to work from 11:30 a.m. to 11:00 p.m., Monday through Friday, with a two-hour break beginning at 3:00 p.m. and a half-hour break beginning at 8:00 p.m.  During both the early and late weeks, the plaintiff was scheduled to work from 11:30 a.m. to 11:00 p.m. on Sundays,

with two half-hour meal breaks beginning at 3:00 p.m. and 8:00 p.m.  During the five or six

months that he worked seven days per week, the plaintiff was scheduled to work those same

hours on Saturdays.

 Douglas testified that, when they make deliveries, deliverymen keep all the cash tips

tendered by the defendants' customers.  When customers paid for meals using credit cards, the

restaurant paid the plaintiff 100% of the tips charged on the customers' credit cards.  Douglas

explained that approximately 60% of the restaurant delivery orders, including tips, are paid by

credit cards, and the restaurant never deducted the credit card commissions it was charged from

the tips that the plaintiff earned.  According to Douglas, American Express charges the

restaurant a 2.9% commission on all payments that the restaurant's customers charge on that

card, MasterCard charges a 2.5% commission and Visa charges a 2.5% commission.  Douglas

testified that, starting in October 2009, all employees were paid by check.  He explained that the

defendants' Exhibit A is a document indicating payments to the plaintiff, from July 2009 through

September 2012, with the plaintiff's signature confirming each payment received.  Douglas

maintained that the defendants paid both the employer and employee tax on the plaintiff's

earnings in 2009, 2010 and the first half of 2011, when the defendants reverted to paying the

plaintiff in cash.

## FINDINGS OF FACT

 The Court adopts the parties' stipulated facts as its findings of fact:

 Defendant 520 Asian Restaurant Corp. owns Chef Yu restaurant in midtown Manhattan.

Douglas owned and operated Chef Yu restaurant at all relevant times.  Defendants 520 Asian

Restaurant Corp. and Douglas were the plaintiff's employers.  The plaintiff worked for Chef Yu

restaurant as a deliveryman from mid-2006 until September 2012, with several interruptions due

to his injury. The plaintiff worked, typically, at least six days per week throughout his employment with the defendants, exclusive of any sick days. The defendants did not keep any records of the plaintiff's work hours. For the first two years of the plaintiff's employment, the defendants paid him $350 twice per month, for a total of $700 per month. For the remainder of the plaintiff's employment, the defendants paid him $500 twice per month, for a total of $1,000 per month. The plaintiff was paid an additional $500 each year instead of vacation time, although payment for the last three years was made after his employment ceased in 2012. Other than these bi-monthly and vacation payments, the defendants did not pay the plaintiff any other amounts.

The defendants paid credit card company commissions on the plaintiff's tips for him. The defendants' payments to the plaintiff did not vary based on his hours worked. In addition to this pay from the defendants, the plaintiff received approximately $1,400 per month in tips from customers in 2007, and approximately $2,000 per month beginning in 2008.

The plaintiff was required to own, use and maintain a bicycle to perform deliveries for the defendants. The defendants did not reimburse the plaintiff for the purchase and maintenance of his bicycle. Employee FICA (Federal Insurance Contributions Act) tax and Medicare tax owed by the plaintiff, in the total amount of $4,112.88, were paid by the defendants as follows: (a) $440.90, allocable to the final 265 days of 2007; (b) $612.00, in 2008; (c) $1,530.00 in 2009; and (d) $1,529.98, in 2010.

In addition to the parties' stipulated facts, the Court finds the following:

The plaintiff worked alternate weeks on two weekly work schedules, referred to as "early weeks" and "late weeks." During the early weeks, the plaintiff worked from 11:30 a.m. to 9:30 p.m., Monday through Friday, with two half-hour meal breaks beginning at 3:00 p.m. and 8:00

p.m.  During the late weeks, the plaintiff worked from 11:30 a.m. to 11:00 p.m., Monday through

Friday, with a two-hour break beginning at 3:00 p.m. and a half-hour break beginning at 8:00

p.m.  During both the early and late weeks, the plaintiff worked 11:30 a.m. to 11:00 p.m. on

Sundays, with half-hour meal breaks beginning at 3:00 p.m. and 8:00 p.m.  During the five or six

months that he worked seven days per week, the plaintiff worked those same hours on Saturdays.

The defendants furnished meals to the plaintiff.  The defendants did not maintain payroll records

and they did not provide wage and hours-related notices to the plaintiff.  The defendants failed to

post notices at their restaurant explaining the laws governing wages and hours.  At all relevant

times, the defendants acted willfully.

## CONCLUSIONS OF LAW

### *Liability*

#### FLSA

"Every employer shall pay to each of his employees who in any workweek is engaged in

commerce or in the production of goods for commerce, or is employed in an enterprise engaged

in commerce or in the production of goods for commerce, . . . not less than" $5.15 an hour

beginning September 1, 1997, $5.85 an hour, beginning on December 24, 2007, $6.55 an hour,

beginning on December 24, 2008, and $7.25 an hour, beginning on December 24, 2009.

29 U.S.C. § 206(a)(1)(C).  "'Tipped employee' means any employee engaged in an occupation

in which he customarily and regularly receives more than $30 a month in tips."  29 U.S.C. §

203(t).

> "Wage" paid to any employee includes the reasonable cost . . . to the employer of
> furnishing such employee with board, lodging, or other facilities, if such board,
> lodging, or other facilities are customarily furnished by such employer to his
> employees. . . .  In determining the wage an employer is required to pay a tipped
> employee, the amount paid such employee by the employee's employer shall be an

> amount equal to - - (1) the cash wage paid such employee which for purposes of such determination shall not be less than the cash wage required to be paid such an employee on August 20, 1996; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title. The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

> 29 U.S.C. § 203(m).

Meals are included within the meaning of "other facilities" furnished by an employer to her employees for the purposes of 29 U.S.C. § 203(m). See 29 C.F.R. § 531.32(a).

> "[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "The regular rate of pay at which the employee is employed may in no event be less than the statutory minimum." 29 C.F.R. 778.107. "The 'regular rate' under the Act is a rate per hour," unless an employee's earnings are determined on another basis. 29 C.F.R. § 778.109.

> When overtime is worked by a tipped employee who is subject to the overtime pay provisions of the Act, the employee's regular rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid.

> 29 C.F.R. § 531.60.

Every employer is required to: (1) maintain and preserve payroll or other records indicating, inter alia, hours worked each workday and wages paid; and (2) post notices explaining the

FLSA.  See 29 C.F.R. §§ 516.2, 516.4-516.6.

> [I]f it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

> 28 C.F.R. § 531.35.

"[D]elivery workers [who] were required to purchase bicycles, which were used and specifically required for their delivery work," are entitled to be "reimbursed for the costs of the bicycles and the necessary repairs, and because they were paid below minimum wage, they are entitled to recover damages for those amounts."  Cao v. Wu Liang Ye Lexington Restaurant, Inc., No. 08 Civ. 3725, 2010 WL 4159391, at *4 (S.D.N.Y. Sept. 30, 2010).

"Any employer who violates the provisions of section 206 or section 207 of the [FLSA] shall be liable to the employee or the employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  However,

> if the employer shows to the satisfaction of the court that the act or omission giving rise to [an action under FLSA] was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], as amended, the court may, in its sound discretion, award no liquidated damages or award any amount not to exceed the amount specified in section 216 of this title.

> 29 U.S.C. § 260.

An FLSA action "may be commenced "within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).

11

New York Labor Law

"Unless otherwise provided by law, the following number of hours shall constitute a legal day's work . . . [f]or all . . . employees, except those engaged in farm work and those affected by subdivision four of section two hundred twenty of this chapter, eight hours."  NYLL § 160(3).

"The basic minimum hourly wage rate shall be: $7.25 per hour" on and after July 24, 2009, until and including December 30, 2013, and $7.15 on and after January 1, 2007, until and including July 23, 2009.  New York Compilation of Code, Rules and Regulations Title 12 ("NYCRR") § 146-1.2, § 137-1.2.  "An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips and if the employee has been notified of the tip credit as required in section 146-2.2 of this Part."  NYCCRR § 146-1.3.

"New York does not have a mandatory overtime law."  Hornstein v. Negev Airbase Constructors, 110 A.D.2d 884, 885, 488 N.Y.S.2d 435, 437 (App. Div. 2d Dept. 1985).  Instead, the Commissioner of Labor issued a Minimum Wage Order for Miscellaneous Industries and Occupations, providing that "[a]n employer shall pay an employee for overtime at a wage rate of 1 ½ times the employee's regular rate for hours worked in excess of 40 hours in one workweek."  NYCRR § 146-1.4.  "The spread of hours is the length of the interval between the beginning and end of an employee's workday.  The spread of hours for any day includes working time plus time off for meals plus intervals off duty."  NYCRR § 146-1.6.  "On each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate."  NYCRR § 146-1.6(a).

 "No employer shall make any deduction from the wages of an employee, except deductions" authorized by law, rule or regulation.  NYLL § 193.1; see NYCRR §§ 195-2.1 and 146-2.7.  "If an employee must spend money to carry out duties assigned by his or her employer,

12

those expenses must not bring the employee's wage below the required minimum wage."

NYCRR § 146-2.7(c). Allowance for tips shall not exceed, "[o]n and after January 1, 2007,

$1.60 an hour for an employee whose average of tips received is between $1.60 and $2.30 per

hour; $2.30 per hour for an employee whose average of tips received is $2.30 per hour or more,"

and "[o]n and after July 24, 2009, $1.60 per hour for an employee whose average of tips received

is between $1.60 and $2.35 per hour; $2.35 per hour for an employee whose average of tips

received is $2.35 per hour or more." NYCRR §§ 137-1, 4(a)(4) and 137-1.4(a)(5). "On and

after January 1, 2011, a service employee shall receive a wage of at least $5.65 per hour, and

credit for tips shall not exceed $1.60 per hour, provided that the total of tips received plus wages

equals or exceeds $7.25 per hour." NYCRR § 146-1.3(a)(1).

     "When tips are charged on credit cards, an employer is not required to pay the

employee's pro-rated share of the service charge taken by the credit card company for the

processing of the tip. The employer must return to the employee the full amount of the tip

charged on the credit card, minus the pro-rated portion of the tip taken by the credit card

company." NYCRR § 146-2.20. "Meals and/or lodging provided by an employer to an

employee may be considered part of the wages paid to the employee." NYCRR § 146-1.9.

     Every employer shall provide her employees: (a) a notice explaining the rates of pay, as

well as the basis thereof and allowances claimed as part of the minimum wage, including tips

and meals, see NYLL §§ 195(1)(a); and (b) a statement with every payment of wages listing,

inter alia, the dates of work covered by that payment of wages, rate of pay, deductions,

allowances claimed as part of the minimum wage and commission, see NYLL§ 195(3). If an

employee is not provided with a notice explaining the rates of pay, working hours and other

provisions of the law concerning her employment, including tips and meals, that employee is

entitled to recover, through a civil action, "fifty dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of two thousand five hundred dollars, together with costs and reasonable attorney's fees." NYLL § 198 (1)(1-b).  If an employee is not provided a statement, as required by NYLL§ 195(3), she is entitled to recover, through a civil action, "damages of one hundred dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of twenty-five hundred dollars, together with costs and reasonable attorney's fees."  NYLL § 198(1)(1-d).  Every employer must maintain and preserve accurate payroll records.  See NYLL § 195.(4).  Since January 1, 2011, "[e]very employer shall post, in a conspicuous place in his or her establishment, notices issued by the Department of Labor about wage and hour laws, tip appropriations, illegal deduction provisions and any other laws that the Commissioner shall deem appropriate."  NYCRR § 146-2.4.

> Under New York law, effective April 9, 2011,
>
> [i]n any action instituted in the courts upon a wage claim by an employee . . . in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.
>
> NYLL § 198(1)(1-a).

Prior to April 8, 2011, New York Labor Law required that "an additional amount as liquidated damages equal to twenty-five percent of the total amount of wages found to be due" be awarded. NYLL § 198(1)(1-a).  "[T]he statutory remedy of an award of . . . the liquidated damages . . . where a willful failure to pay wages has been established, [is] limited to actions for wage claims founded on the substantive provisions of Labor Law article 6." Gottlieb v. Kenneth D. Laub & Co., 82 N.Y.2d 457, 464, 605 N.Y.S.2d 213, 217 (1993).  District courts in this circuit disagree

about whether a plaintiff may recover liquidated damages under both the FLSA and state law for the same violations.  Compare, Wicaksono v. XYZ 48 Corp., No. 10 Civ. 3635, 2011 WL 2022644, at *7 (S.D.N.Y. May 2, 2011) (plaintiff may recover liquidated damages under both FLSA and New York Labor Law and citing cases that disagree on the issue), and Zubair v. Entech Eng'g P.C., 900 F. Supp. 2d 355, 360, 361 n.4 (S.D.N.Y.)(noting it is not clear whether the plaintiff could recover under FLSA and state law and citing cases that disagree on the issue), with Andrade v. Kwon, No. 3:08 cv 479, 2012 WL 3059616, at *6 (D. Conn. Mar. 26, 2012) (not allowing liquidated damages under the FLSA and state statute because their liquidated damages provisions do not serve fundamentally different purposes).  The Court finds that the prevailing plaintiff may recover liquidated damages under both the FLSA and New York Labor Law for the same violations.  Under New York Labor Law, a "plaintiff may recover wages that were not paid during the six years that preceded the filing of the complaint if he is successful on his claim under Labor Law article 6."  Dragone v. Bob Bruno Excavating, Inc., 45 A.D.3d 1238, 1239, 847 N.Y.S.2d 251, 253 (3rd Dep't 2007); see NYLL § 663(3).

The Court finds that the defendants violated the provisions of sections 206 and 207 of FLSA, and they are liable to the plaintiff in the amount of his unpaid minimum wages and overtime compensation.  The plaintiff is entitled to be reimbursed for the costs of the bicycles he used for his work and the necessary repairs made to those bicycles.  The Court finds that the defendants also violated NYLL article 6, and they are liable to the plaintiff for the amount of his: (i) unpaid minimum wages; (ii) overtime compensation; and (iii) spread of hours.  The defendants are liable to the plaintiff for damages he incurred commencing from April 11, 2007, under New York Labor Law, and April 11, 2010, under FLSA.

*Damages*

"Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999). Establishing the appropriate amount of damages involves two steps: (1) "determining the proper rule for calculating damages on . . . a claim"; and (2) "assessing plaintiff's evidence supporting the damages to be determined under this rule." Id.

Minimum Wage and Overtime Compensation

The plaintiff is entitled to the minimum wage for 56 hours per week, overtime compensation for 16 hours per week and compensation under the spread of hours provision of New York law, for 3.5 hours per week, during the statutory period April 11, 2007, to September 2012.

Tip Credit

The defendants are not entitled to use the tip credit against the plaintiff's minimum wages under FLSA because they failed to inform him about the provisions of 29 U.S.C. § 203(m). They are not entitled to use the tip credit against the plaintiff's minimum wages under New York's Hospitality Industry regulations, for the period commencing January 1, 2011. However, New York's Minimum Wage Order in effect prior to January 1, 2011, did not require an employer to give an employee notice, as a condition for taking a tip credit. See NYCCRR § 137-1.4. Thus, the defendants are entitled to use the tip credit, under New York law, for the period prior to January 1, 2011.

Meals

Douglas testified that meals were furnished to the plaintiff by the defendants and he saw the plaintiff eat meals furnished by the defendants, "from time to time." Since meals were furnished to the plaintiff, they may be considered part of the plaintiff's wage, and the defendants are entitled to receive credit for furnishing two meals per day as follows: (a) $4.90 per day, prior to July 24, 2009; and (b) $5.00 per day, starting July 24, 2009.

Bicycle Purchase and Maintenance

The plaintiff failed to present any credible evidence to support his request for bicycle purchase and maintenance damages. Thus, no basis exists upon which to ascertain an amount of damages for the cost of purchasing and maintaining bicycles.

New York Penalties for Lack of Notice

Penalties are warranted for the defendants' failure to provide requisite notices under New York law. The penalties may not exceed a total of $2,500 per year, for each of the years 2011 and 2012, resulting in a total penal amount of $5,000.

Total Damages

The Court finds that the defendants' calculation of damages, Docket Entry No. 36-1, totaling $30,008.81, which includes $25,008.81 in minimum wage, overtime compensation and spread of hours damages and $5,000 in penalties, for failing to provide requisite notices under New York law, is reasonable and appropriate for an award in this case.

***Liquidated Damages***

The defendants failed to show, to the Court's satisfaction, that the conduct giving rise to this FLSA action was undertaken in good faith and that they had reasonable grounds for believing that their conduct was not a violation of FLSA. Therefore, the plaintiff is entitled to

liquidated damages under FLSA in an amount equal to the amount of the minimum wage and overtime compensation, owed during the three-year statutory period: 2010, 2011 and 2012. The amount of liquidated damages under FLSA is $11,734.55.

The defendants also failed to show they had a good faith basis to believe that their underpayment of wages was in compliance with the law. The plaintiff is entitled to liquidated damages, under New York law, in the amount of $15,011.91; this amount includes 25% of $13,329.19 and 100% of $11,679.62. The total liquidated damages under FLSA and New York law to which the plaintiff is entitled is $26,746.46.

### Prejudgment Interest

"It is well settled that in an action for violations of the Fair Labor Standards Act prejudgment interest may not be awarded in addition to liquidated damages." Brock v. Superior Care, Inc., 840 F.2d 1054, 1064 (2d Cir. 1988). However, New York law does not bar an award of prejudgment interest in addition to liquidated damages. See Thomas v. Istar Financial, Inc., 652 F.3d 141, 150 n.7 (2d Cir. 2011). "Interest shall be recovered upon a sum awarded . . . because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." New York Civil Practice Law and Rules ("CPLR") § 5001(a). "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." CPLR § 5001(b). "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." CPLR § 5004.

18

The Court finds that the plaintiff is entitled to prejudgment interest, under New York law, computed at the rate of nine percentum per annum upon $ 30,008.81, namely $2,700.79, from a single reasonable intermediate date: April 11, 2010. Accordingly, the plaintiff is entitled to three years of prejudgment interest in the total amount of $8,102.37.

***Postjudgment Interest***

Postjudgment interest is governed by the federal statute providing that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment," and is "compounded annually." 28 U.S.C. §§ 1961(a), (b). The plaintiff is entitled to postjudgment interest, as noted above.

***Conclusion***

For the foregoing reasons, the plaintiff is entitled to damages as follows: (1) $30,008.81, in damages; (2) $26,746.46, in liquidated damages; (3) $8,102.37, in prejudgment interest; and (4) postjudgment interest.

Dated: New York, New York
      December 16, 2014

SO ORDERED:

*Kevin Nathaniel Fox*
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE